Southern Ry. Co. v. Adkins' Admr.

CASE 21.—ACTION BY GEORGE M. ADKINS' ADMINISTRA-
        TOR, AGAINST THE SOUTHERN RAILWAY COM-
        PANY, ETC.—March 25. 1909.

## Southern Ry. Co. v. Adkins' Admr.

Appeal from Whitley Circuit Court.

M. J. Moss, Circuit Judge.

Judgment for plaintiff, defendants appeal.—Affirmed.

1. Appeal and Error—Harmless Error—Error Favorable—Instructions.—Railway companies, sued for death caused by an explosion of a car of dynamite, cannot complain of an instruction that, unless their employes shoved a car against the car of dynamite with such unusual violence and recklessness as to cause an explosion, plaintiff could not recover, since the instruction ignored the companies' liability for negligence in leaving the car in the yard for 11 or 12 hours, unguarded and without warning.

2. Explosives—Negligence—Evidence—Rules of Railroad Company.—In an action against railroad companies for death caused by the explosion of a car of dynamite in their yard, it was proper to allow their rules to be read to the jury to show negligence.

3. Death—Action for Negligent Death—Evidence—Life Tables.
—In an action against railway companies for negligent death,
life tables were properly admitted in evidence.
4. Province of Jury—Weight of Evidence.—It is the jury's prov-
ince to hear the evidence and determine its truth and weight.
5. Explosives—Negligence—Evidence—Weight.—Weight of the
evidence in an action against railway companies for death
caused by an explosion of a car of dynamite in their yard held
to show that the explosion was caused by a violent kicking
of cars against such car, and not by a rifle shot fired by a
third person.
6. Appeal and Error—Review—Scope—Conclusiveness of Ver-
dict.—It is the province of the Court of Appeals to see that
parties have legal trial, but not to weigh the evidence, that
duty belonging to the jury; and the court should only disturb
a verdict in extreme cases, when no errors have been com-
mitted by the lower court.
7. Explosives—Negligence—Liability of Railroad.—In an action
against railway companies for death caused by an explosion
of a car of dynamite in their yard, it was improper to restrict
plaintiff's right to recover to a finding of negligence in switch-
ing cars against such cars, since he was entitled to recover if
the companies negligently left the car in their yard for 11
hours, without guarding it against trespassers, etc.
8. Explosives—Damage By—Liability.—One handling explosives
is not liable for injury caused by an explosion thereof, if he
has taken necessary precautions in attempting to save others
from injuries through an explosion.
9. Explosives—Negligence—Liability.—Railway companies are
liable for damage caused by an explosion of a car of dyna-
mite, regardless of the cause of the explosion, if they failed
to exercise care to prevent it.

W. A. HENDERSON, WILLIAM LOW, J. W. ALCORN, H. H.
TYE, and HUMPHREY & HUMPHREY, for appellants.

S. M. PAYTON, SHARP & SILER, R. L. POPE and HAZEL-
RIGG, CHENAULT & HAZELRIGG, for appellee. (No briefs—
record out of office.)

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

Appellants, Southern Railway Company and Louis-
ville & Nashville Railroad Company, own and use
in common a railroad yard in Jellico, a town of about
3,500 inhabitants. In the month of September, 1906,
an engine of the Southern Railway placed in the
north end of this yard a car loaded with 400 boxes

of dynamite and 50 boxes of nitroglycerin, which were placed on top of the dynamite. This car was placed in the yard about 8 o'clock in the evening, and remained there until near 8 o'clock the next morning, when the dynamite and nitroglycerin exploded with terrific force, killing about 16 persons and injuring over 100, destroying many buildings, and injuring nearly all the others in the town. The explosion made a hole in the ground 15 or 16 feet deep, 60 or 70 feet long, and 40 or 50 feet wide. The car containing the dynamite and nitroglycerin was completely obliterated, as well as the one next to it, loaded with pig iron, and the end of the coal car that was next to the car loaded with pig iron was warped and blown in. It and other similar cars were moved on the track, by the force of the explosion, 40 or 50 feet. Adkins, at the time of the explosion, was in a brick business house about 200 yards from the car loaded with dynamite and nitroglycerin. The explosion caused the house to fall on and injure him, which resulted in his death. This action was instituted to recover damages for the loss of his life. It was alleged that his death was caused by the negligent or wrongful acts of appellants or their servants. The issues were formed, the testimony heard, and the jury returned a verdict in behalf of appellee for $7,500.

The court gave to the jury the following instruction: ''Unless you believe from the evidence that the employes of the defendants, or either of them, kicked or shoved a car or cars against the car of dynamite, and that in so kicking or shoving the car or cars they did so with such unusual violence, force, and recklessness as to cause the contents in the car to explode, you

will find for the defendants; but, if you believe that
such was the cause of the explosion, you will find
for the plaintiff.'' In addition to this instruction,
the court gave the jury the usual instruction on the
measure of damages and properly defined negligence
and ordinary care. It will be observed that under
the instruction quoted the court did not authorize the
jury to find for appellee unless they believed from the
evidence that the car or cars were kicked or shoved
against the car containing the dynamite and nitro-
glycerin and that the kicking or shoving was done
with unusual violence, force, and recklessness. The
court did not seem to think that there was any evi-
dence of negligence on the part of appellants in their
placing and leaving the car loaded with dynamite
in their yard in the town for 11 or 12 hours without
any one to protect it, or without giving notice in
any manner of its contents and the danger incident
thereto to any one. By this instruction the court ex-
onerated appellants from liability, even though they
negligently permitted another car in their yard to
roll against the one loaded with dynamite and nitro-
glycerin causing it to explode. Appellants certainly
have no cause to complain of errors in the instruc-
tion against their interest.

Appellants contend that the court erred in per-
mitting their rules to be read to the jury to show
negligence, and allowing the introduction of the
''Life Tables.'' This court has so often considered
and determined these questions against the conten-
tions of appellants that we deem it unnecessary to
discuss them and cite authorities thereon. This dis-
poses of all the grounds for reversal presented by
appellants save one, and that is: ''The verdict of

the jury is flagrantly against the evidence." They present this question with a great deal of force.

Appellants admit that a number of witnesses on behalf of appellee testified to facts showing that their agents had shunted cars against the car loaded with dynamite and nitroglycerin, which caused the explosion; but, on the other hand, they claim that appellants' testimony shows such a state of facts that it was impossible for this to have occurred, as there was no engine in the yard, especially in the south end, that could have shunted the cars against the car loaded with dynamite and nitroglycerin. Appellee's testimony shows that the car or cars were kicked by an engine from the south end of the yard against the car and caused the contents to explode. Appellants theory is that the dynamite and nitroglycerin were caused to explode by one Walter Rodgers shooting a rifle ball into them. On account of the importance of the case, we will not content ourselves with a general statement of the testimony, but will give a detailed statement and quote what each witness said as to what caused the explosion. However, it is necessary to describe the situation of the railroad yard in order that the testimony quoted may be understood.

It appears that the yard is about three-fourths of a mile long; that the general course is north and south, with the main tracks running through the center, and four or five side tracks on either side of it. The station is a little north of the center of the yard, and the water tank is a little south of the center, the car containing the dynamite and nitroglycerin was about 200 yards from the north end of the yard, and was situated, according to the testimony of

most of the witnesses, on the west side of the main track, on what is known as the "tank track;" there being one track, known as the "middle track," between it and the main track, and about 400 yards north of the station. The Commercial Hotel is located near the main track a short distance south of the yard. The track farthest east of the main line is the one under which the ash pit and the turntable are located, and it connects with the main track in the vicinity of the Commercial Hotel. The tracks in the yard are downgrade from the south to the north.

The witness Thos. Tate, after stating that he saw the explosion, was asked: "Q. Do you know what caused the explosion? A. Yes, sir; I suppose I do. Q. State what. A. It was a car coming from the south, and butted against another, and just flashed like lightning, and tore things up. Q. Were you looking at it at the time of the explosion? A. I was looking at it and talking about the car" (meaning the car that was moving from the south towards the car loaded with dynamite and nitroglycerin).

Jack Kincaid testified as follows: "Q. Did you see this car at the time it exploded? A. Yes, sir. Q. What caused it to explode? A. This car of pig iron. Q. Where did it come from? A. It came from the lower end of the yard. Q. How fast was it coming when you saw it? A. It was running faster than it ought to be. They gave it a kick, and flew, and left it. Q. Was anybody down there with it? A. No, sir. Q. How far was it from this exploded car at the time you say it was kicked? A. It was a right smart piece, about the length of five or six cars. Q. How many cars were kicked? A. Two. Q. Box or

flat cars? A. Flats or pig iron cars. Q. How high up was the railing that the pig iron was in? A. It was a deep car. It was the same as a box car. It was one of them big iron cars. I forget how much they hold. There was two of them hit it. Q. How long after you saw them before they bumped? A. It was right immediately, and then everything was falling and rattling, and people hollering and screaming.''

Robert Hale testified as follows: ''Q. Do you know anything about this dynamite car being hit and exploded in the yard? A. I know I heard some cars bump together and I heard the explosion. Q. How long after the cars bumped together before the explosion? A. Just a second. Q. With what force? A. They struck very hard, because I made the remark to the clerk: 'That fellow is punching hard this morning.' Q. How long after the bump before the explosion? A. I had hardly got the words out of my mouth.''

T. A. Butcher testified as follows: ''Q. If you know what produced that explosion, I will get you to state to the court. A. I know this. I saw a string of cars come down and hit together, and then in an instant the explosion come. I was sitting there talking to a colored man by the name of Tate, and we were at work up there together, and the flash come, and I said, 'Good God; look at the lightning!' ''

Jewett Garnett testified as follows: ''Q. Just before the explosion occurred, did you see a Southern engine, or any other engine, moving cars in the switchyard down towards the southern end? A. I could not see whether it was moving any cars or not; but it was going in and out down there. Q. How close up did that engine continue to the time of the

explosion? A. Right up, from what I could see of it. It was on the left-hand side coming this way, going north. The engine was headed south, but was going north. Q. You say that it was running north? A. Yes, sir; it was moving back and forwards, and the last time I noticed it it was standing still after the explosion. Q. Well, just before that explosion, which way was it going the last time you noticed? A. I do not remember which way it was going then, when I last noticed it. It was just moving back and forth, and we were hurrying to load the car. Q. How long before the explosion did you notice it? A. Two or three minutes, I guess. Q. Well, did you see it after the explosion? A. Yes, sir! I came in about five minutes after the explosion. Q. Where was it then? A. It was setting over there near the switch that turns off for coming up this way, this side of the Commercial Hotel.''

Geo. Henderson testified as follows: ''Q. Well, do you know anything about this explosion and collision of cars? A. I think I do. Q. Tell the jury what you know, and what your opportunities were for knowing. A. I saw the engine switching up the south end of the yard there, and give the cars a kick, and they came right on and struck that box car that was standing there that exploded, and when the cars came together there was a flash of lightning run out, and the thing went off. * * * Q. You understand that location, do you (pointing to plat)? A. Yes, sir; right there is where they were kicking those cars. This is the Commercial Hotel. Q. Yes. A. Right in here, now, is where they were kicking those cars. Q. Were they kicking them from up this way? A. They kicked them from here right down this way. Q. How

far did the engine follow them? A. The engine never followed them very far. They gave them a kick, and cut loose. Q. How many cars were turned loose in that kick? A. I couldn't say. I was too far away, and there were cars on each side of the track where the cars were running. They were brand new steel cars; Southern steel cars, some of them was. Q. And you watched them? A. Yes, sir; I saw them when they struck. Yes, sir; I did. Q. How did they strike? What degree of speed did they have? A. They had a pretty good speed. * * * Q. Just a lone car standing by itself? A. Yes, sir; that box car was standing there by itself. Q. And the thing that hit it was a new steel coal car? A. Yes, sir. Q. And when it bumped that lone dynamite car up there she bursted? A. In a flash of lighting. Q. And you heard the explosion? A. Yes, sir. Q. How many dynamite cars exploded there that day? A. There wasn't but one. Q. But it was of a sort of a double-barrel order? A. Yes, sir; I guess there were two kinds of material in it is what made that double explosion.''

Mrs. Murphy testified as follows: ''Q. State where you last saw those cars. A. The last I saw of them they were going. They were in behind a building. Q. Were they moving rapidly? A. Yes, sir; they set them in rapidly. Q. You say you know where the explosion was. State how they were moving with reference to that point. A. They were moving fast. Q. In what direction? A. Going towards where the explosion was. Q. Did the engine kick those cars in more rapidly or less rapidly than usual? A. They were kicking them in fast was what made me look

out north. It cut loose, and the cars they went on down the track. Did it damage the house you were in? A. Tore it all to pieces.''

The witness Fred Densmore, after stating that he was on the ground where a tent for a show was being erected at the time the explosion occurred, and that he had just arrived at that place, which was on the east side of the railroad, when the explosion occurred, he stated that he came from the west side of the railroad, where he resided, and crossed the tracks near the Commercial Hotel, and continued as follows: ''Q. Did you see an engine there, or any switching there in the yard? A. I saw an engine right there at the road crossing just as I crossed over. I stopped here (indicating) just about a minute and a half to wait for the engine to get out of my way until I could get over. Q. What was the engine doing? A. Pushing some cars around there. Q. Which way was the nose of the engine turned? A. Towards Knoxville. Q. The cowcatcher was towards Knoxville? A. Yes, sir. Q. In what way was it pushing those cars? A. Right back down this way. Q. You say that you stopped there at that time for them to get out of your way? A. I stopped right here in the road crossing. It was in my way. That is the reason that I stopped. As quick as it pushed across there I went on across. Q. Which did it push the cars down, fast or slow? A. Right back down that way fast. Q. You say that was a few minutes before the explosion? A. Yes, sir. Q. Did you see what became of that engine? A. No, sir; I never noticed what became of it, any more than just about the time I got half way over to the show ground it was coming back up this way,

after it had shoved the cars. Q. What became of the cars it shoved? A. The cut of cars went on yon way. Q. Did you afterwards see where the car of dynamite exploded? A. Did I see it? Q. Yes, sir. A. Yes, sir. Q. In what direction did those cars kicked loose go with reference to that car of dynamite? A. They went right toward it."

Joseph Phillips testified as follows: "Q. Did you see anything up there, or did you see the explosion? A. Yes, sir; I saw the explosion, and saw the engine switching. Q. Did you see anything just before? Did you see any switching in the yard of the railroad company just prior to the explosion? A. Yes, sir; I saw an engine switching. Q. Where was that engine? A. It was on the south end of the yard. Q. The south end? A. Yes, sir. Q. Do you know where the old Commercial Hotel, or the Mountain Home Hotel, is situated? A. Yes, sir. Q. Where with reference to that hotel? A. Well, the engine was switching right there at the Commercial, back in this side of the Commercial, toward the depot. Q. From the Commercial Hotel toward the depot? A. Yes, sir. Q. Now explain to the jury what you saw that engine do. A. Well, she backed in there with some cars and cut loose from them, and the cars came on down toward the north end, and the engine went back that way (indicating south). Q. How did those cars go, slow or fast? A. They were going fast. I call it pretty fast. Q. What did the engine do when it cut loose from the cars? A. It went back toward the Commercial Hotel. Q. How did it go back, fast or slow? A. It went tolerably fast. Q. Did you see what became of those cars? A. They went on down there and butted a box car. Q. What box car was that? A. It was the one, I

reckon, that blowed up. It was supposed to be the one. Q. It was right where the explosion occurred? A. Yes, sir. Q. How did it butt that car? A. It butted it pretty heavy. Q. When was that explosion with reference to the butting of that car? A. Right then, instantly. Q. Right then, instantly? A. Yes, sir.''

James Powers stated that Doug's passenger train left the station a few minutes before the explosion, and continued as follows: "I saw an engine coming from the southern end of the yard, and it seemed like there was either one or two cars to it, and it kicked the car or cars back in. I saw one. I didn't pay very much attention to the car, for it attracted my attention the engine going in such a flight. I wasn't used to seeing them switching so fast, and that drawed my attention, and I noticed the engine, and it went out of my sight above the depot, and I just turned around, and aimed to step across, and then the explosion happened, and that was the last I knowed. I didn't know anything more for some time. It knocked me down. Q. Do you know what became of that car or cars that was kicked by that engine? A. It came north toward where they showed me afterwards, to where the hole was dug out in the ground, where that car was torn up."

William Lovitt testified as follows: "Q. Now, Mr. Lovitt, please state to the jury fully what you saw take place just prior to and at the time of the explosion. A. Well, I was sitting there in my door, and I was looking at Doug's train going out—that was the Middlesboro train; and I was still sitting there, and these cars followed him, and they looked like steel gons to me, until they came in and struck this car, where them cars were setting there. I saw

one box car, and looked like flat cars, and when they struck it the explosion went off. That is all I seen. Q. You say— Where did those cars come from? From what direction? A. They came from the south end of the track. Q. They came from the south end of the track? A. Yes, sir. Q. What rate were they going, Mr. Lovitt? A. They were going at a right smart rate. They bumped together pretty hard when I saw them. Q. And running from the south end up that way? A. Yes, sir; they were running from the south end. Q. Did you see the engine? A. No, sir; I never saw the engine. I saw the smoke of it. The engine was in behind the depot from where I was sitting. From where I was sitting I couldn't see the engine. Q. Could you see which way the engine went after it cut loose from those cars? A. The engine was going south. Q. And when was that explosion with reference to the time those cars coming north struck the other car? A. How is that? Q. When was the explosion with reference to the time that those cars coming north struck the other car? A. Just as soon as they came on down and hit it. Q. When they hit it the explosion occurred? A. Yes, sir; just as soon as they hit it."

James Scarbrough testified as follows: "Q. State what you heard at the time of the explosion, and immediately before, if anything. A. I was in the room there, with nothing to attract my attention, and I heard an engine running, switching cars and running and I heard one unusually heavy bump, and it attracted my attention that it was something unusual, and immediately after I heard two reports. I thought something moved under me. I was on the second floor, and it sounded as though they turned some heavy object over two times, and immediately I heard the windows and glass begin to fall."

A. B. Botts testified as follows: "Q. Did you see any switching going on in the yard just before the explosion? A. One engine. Q. Where was it? A. Up south from the depot. Q. Where with reference to the

Commercial Hotel? A. Between the Commercial Hotel and the depot. Q. What kind of an engine was it? A. I don't know. Q. What did you see it doing? A. I saw it kick three coal cars back north, and she broke loose or cut loose, and she went back towards the Commercial Hotel. Q. Did she kick them back rapidly or slowly? A. Fast. Q. Any one on the cars? A. One man. Q. What became of him? A. He jumped off and ran back toward the engine. He jumped out from under his cap or hat, and never stopped to get it. Q. Did you know the man? A. No, sir. Q. How far did these cars run when you were noticing them? Where did you last see them? A. The last time they had turned back—two of them. Q. Which way? A. This way. Q. What started them? A. I don't know. Q. Did they turn back before or after the explosion? A. It seemed to be about the same time. Q. Did you hear the crash of the cars? A. I just heard a big noise. Q. Was you looking at them when the noise came? A. I was looking when they jumped back. Q. How far did they jump back? A. I don't know; it knocked me down. Q. Were the cars running up to the moment of the noise? A. Yes, sir. Q. And you saw two kick back? A. Yes, sir. Q. What became of the others? A. I don't know. I just seen everything bulged up, and it knocked me down. Q. How far had that man got back towards the engine? A. Thirty or forty yards. Q. Where did he jump? A. Just about the tank. Q. Is it kind of downgrade toward the Kentucky side? A. Yes, sir. Q. And you was up to the south? A. Yes, sir."

M. L. Lloyd testified as follows: "Q. Did you see any trains switching in the yard? A. Yes, sir. Q. Tell the jury what you saw that engine doing. A. I

had started to the postoffice, and had got to the railroad, and a train come down, and I stopped and waited until it passed me. Q. What direction? A. I live east, and was going west. Q. What direction was the train running? A. South. I crossed the track and got down to the hotel, and I stopped and came back on a different track. I noticed a fellow running along with three or four cars in front of him, and he cut them off and let them go. Q. What kind of cars were they? A. I never paid any attention. Q. Three or four of them? A. Yes, sir. Q. How did he kick them back, rapidly or slowly? A. Pretty fast. Q. How far were they from the explosion at the time he cut them loose? A. From 30 to 40 yards. Q. Did you notice the cars after he cut them loose? A. I noticed them going up, and nobody with them. I thought there should be. Q. Did you notice a car up there? A. Just as I turned around the explosion occurred. Two noises, just like a thought. * * * Q. What became of the engine? A. It went south."

The following persons saw an engine in the south end of the yard in a position to shunt the cars against the car loaded with dynamite and nitroglycerin, immediately preceding and immediately after the explosion:

Jack Kincaid testified as follows: "Q. Did you see any engine on the yard? A. None but the one that was switching. Q. Did you see the passenger engine? A. Yes; it was gone. Q. After the passenger engine left, that was the only one you saw? A. Yes, sir. * * * Q. Did it have steam up? A. Yes, sir. Q. Did you see it when it was getting these cars and switching? A. Yes, sir. Q. Was it kicking the cars while switching. A. Yes, sir. Q. How many cars

did it kick? A. Two. Q. Were these cars coal cars?
A. Yes, sir.

A. L. A. Housely testified as follows: "Q. Tell
what took place before the explosion. Did you see
an engine switching any cars toward the place where
the car of dynamite was standing in the yard? A.
Yes, sir. Q. Tell, now, what happened, and what
caused you to see it. A. I could not tell you as to
how many of the cars were being pushed by the en-
gine, but directly a train came up there, and I was
shoeing a horse at the time, and the horse got fright-
ened, I had to stop until after the engine and cars
had passed back, and the explosion came after I
started ahead with my work. Q. Did you see the
engine, and can you tell what one it was? A. I did
not pay that much attention to it. Q. What did you
do immediately after the explosion? A. I went down
to the place. Q. Did you see the engine come back
toward your shop about the time or just after the
explosion—the one that had been switching? A. I
do not know whether it was the engine or not. I saw
an engine up here close, but whether it was the same
engine or not I could not tell."

Geo. Sweat testified as follows: "Q. Did you
observe a switching crew operating in the south end
of the yard about that time? A. Yes, sir; Clear Fork
train was making up to go out on Clear Fork, and
it went to the south end of the yard before the pas-
senger engine pulled out, and I saw the smoke up
towards the Commercial Hotel about or a little be-
fore the explosion, but I could not see the engine.
Q. Was it moving freight cars in the yard? A. Yes;
they had been."

D. D. Scott testified as follows: "Q. Just before you went into the drug store, did you observe any switching in the south end? A. Just before I got to the store, across in front of the drug store, I noticed a freight train switching on the south end, and looked like it was coming in from the south end and going towards the depot. Q. Was that engine pulling or pushing cars? I think the engine was hidden from me by the Commercial Hotel. I think I could hear the engine, but I saw the cars go in front."

Jewett Garnett testified to seeing an engine switching in the south end of the yard, as hereinbefore copied, and as follows: "Q. And that was the same engine that had been doing the switching? A. Yes, sir; it was standing over here (meaning on the track leading to the turntable and ash pit), popping off, between the Hackney building and the Commercial Hotel. Q. It was out on one of these tracks that run out toward the Hackney building? A. Yes, sir; it was somewhere near here. Q. When an engine pops off that way, it is because the steam is very high, is it not? A. Yes, sir; I suppose that is what it is for. Q. And this engine you saw lying there was full up with steam? A. Yes, sir; the steam was up and popping off. * * * Was you looking at that engine at the time of the explosion? A. No, sir; I had come out of the door of the ice car, and we had one block too many, and was putting it back, and looked out and seen the engine up there, and before I got the ice back the explosion occurred. * * * Q. It went on one of the tracks toward the Hackney building? A. Yes; on toward the turntable. Q. It is one of these tracks toward the Hackney building? A. Yes, yes; it is the track that goes toward the Hackney

building, and this is the one that goes toward the turntable. Q. And this engine was pulling south and emitting a great deal of smoke? A. Yes; you could see it was coming south. Q. And when you got there it had backed out on this track, and was popping off when you got there? A. Yes, sir. Q. And the man said, 'It is all over?' A. Yes."

W. S. Harkness, manager of the Jellico Heat & Power Company, testified as follows: Q. State whether or not there was another engine had been switching cars just before that explosion. A. I could not say whether it had been switching or not. Immediately afterwards I saw the smoke near the Commerical Hotel, and another engine hitched on my car of ice and brought it up. (Witness had been loading a car with ice a few hundred yards south of the railroad yard.) * * * Q. When you got to this crossing at the Commercial Hotel, where was that engine located, if you know? A. I come up on the switch engine at a point about the letter E, I should judge about 100 feet, or possibly 150 feet, from the road crossing near the Commercial Hotel, and north of the railroad crossing. This engine was backing, and the car of ice was attached to the head of the engine, and the engine was backing, and I was on the engineer's side, and I got off and come around the tender, and there was a railroad man—looked to me like an engineer of the switching crew—and he said, 'We have done something.' Do not remember what the exact words were. And we said, 'What is the matter?' and he said, 'That car of dynamite is blown up.' There was an engine standing on the turntable track, and the Daisy track are side by side. There was an engine standing on the turntable track. Q.

Did this man who come across there come from this engine? A. He was coming from this point on the Harkness (Hackney) track. * * * Q.When did you notice the smoke of what you took to be an engine up in the yard? A. When I come out and looked to see what the trouble was. Q. Where was the engine at that time? A. Seemed to me to be alongside of the Commercial Hotel. Q. How far is the Commercial Hotel from where you were? A. I could not say, but I should judge, taking it in city blocks, it would be about four blocks.''

Geo. Henderson testified as follows: ''Q. Tell the jury what you know, and what your opportunities were for knowing. A. I saw the engine switching up in the south end of the yard there, and give the cars a kick, and they came right on down and struck that box car that was standing there, that exploded, and when the cars came together there was a flash of lightning run out, and the thing went off.'' (See, also, the quotation heretofore copied from his testimony.)

Mrs. Nettie Murphy testified as follows: Q. Did you notice anything going on in the yard previous to the explosion? A. I noticed an engine switching there. Q. How long before the explosion? A. Just a few minutes. Q. Where was the engine when you saw it? A. Up above the depot, towards the Commercial House. Q. South of the depot? A. Yes, sir. Q. What was it doing? A. Setting some cars in. * * * Q. What did you see the engine doing? A. I happened to look out. The engine was making an awful noise. They were setting them in here (indicating). They set them, and they run back. The engine run south. My little boy was with me in the kitchen, and

I just turned around and picked up the stove hook, and I heard it hit the other car, and the explosion went off.''

Scott Oaks testified as follows: ''Q. Where were you at the time of the explosion at Jellico in September last? A. I was between the depot and the Commercial Hotel—what is known as the 'Mountain Home Hotel' now. Q. State whether or not you saw any switching in the yards just prior to the explosion. A. Yes, sir; I saw an engine south of the depot doing some switching over on the right-hand tracks as I was going south, up towards the Commercial Hotel. Q. Which way was that engine headed—the nose of it, the cowcatcher? A. It was headed south, towards Knoxville from Jellico. Q. How long, Mr. Oaks, was that before the explosion? A. Well, it was between a minute and two minutes; maybe three minutes. I don't know exactly. Q. Do you know where the dynamite car was that exploded? A. No, sir; nothing more than I know where the hole was after the explosion. Q. Do you know where the hole was? A. Yes, sir. Q. Well, from that evidence as to where it was, where were those cars—in what direction was those cars from this car of dynamite, where they kicked in there? A. They were going towards that hole. Q. State whether or not they were going slow or fast after they were kicked. A. They were going fast.''

Jack Burns, superintendent of the Proctor coal mines, testified as follows: ''Q. Where was that engine? A. It sounded down there by the depot. I couldn't tell how close. The Jellico Grocery building was between me and the car. Q. How could you tell that the engine was there? A. By hearing it. Q.

By hearing it? A. Yes, sir. Q. And how long was that before, and when was that with reference to the time of, the explosion? 'A. I will say a minute or a minute and a half. There was enough time for me to walk across the street. I started down through the yard toward the railroad when the explosion occurred. Q. How far did you walk, Mr. Burns? A. Oh, I guess 50 or 60 feet, or maybe 75 feet; say 75 feet.''

E. L. Grimes stated that he waited for an engine to leave the crossing, so that he could go to his home near the Commercial Hotel, on the west side of the railroad; that as soon as the engine cleared the crossing he walked to his house, and within a few minutes the explosion occurred.

S. S. Trammell testified that, about one minute after the explosion, he saw an engine with steam up in the south end of the yard, near the Commercial Hotel. Also see the quotations from the testimony of Fred Densmore, Joseph Phillips, James Powers, William Lovitt, A. B. Botts, and M. L. Lloyd.

We find that appellee produced 14 witnesses, some of whom saw the collision and the explosion, and the others saw cars kicked in the direction of the car loaded with the dynamite and nitroglycerin a moment or two before the explosion. Appellee also introduced 18 witnesses who saw an engine switching in the south end of the yard, immediately before and after the explosion, and at a place from which it could have shunted the cars and caused the explosion.

Appellants' position, in short, is that all these witnesses were in error, for the reason that, first, no engine was at the place or in a position to have kicked cars against the car loaded with dynamite and nitro-

glycerin; second, if an engine had been in such a position, it could not have done so, for there were other cars upon the track between it and the car containing the dynamite and nitroglycerin. Appellants contend that the explosion was caused by one Walter Rogers shooting into the car with a 22 rifle. We will quote the testimony on these three propositions in the order they are stated.

Appellant's train dispatcher, located in Knoxville, Tenn., testified from the train sheets that he had before him, and which were made by him from reports by telegram as to arrival and departures of trains in and from Jellico on the morning of the 21st of September, 1906, the day of the explosion, as follows: "Passenger engine, No. 1784, left at 6:15 a. m. Freight engine, No. 680, left at 7:35 a. m. Freight engine, No. 686, arrived at 7:35 a. m. Switch engine, No. 277, no time given. Doug's engine, no time given. Show engine, No. 111, no time given. Proctor Coal Company's engine, in and about yard all the time."

The evidence shows that neither engines Nos. 1784, 680, 277, 111, Doug's engine, nor the Proctor Coal Company's engine, was in the yard at the time of the explosion, or, if there, were not in a position to have kicked cars against the car containing the dynamite and nitroglycerin. This eliminates all the engines reported by the train dispatcher, except engine No. 686, which brought into Jellico two freight cars, according to the conductor, or three, according to the dispatcher from his train sheet. This engine, as stated, arrived in Jellico at 7:35, as per train sheet, or at 7:40, according to the conductor's register at depot in Jellico.

W. F. Robertson, who at the time of the explosion was agent for the Southern and the Louisville & Nashville Railroad Companies, stated that engine No. 686 arrived in Jellico at 7:35 with two loaded cars.

J. W. Cook testified as follows: "Q. Did you see any immediately afterwards? Did you see 686? A. Well, yes; but it was over there. Q. Where was it? A. It was on the pit—cinder pit. Q. Was that engine over there at the time you were looking around at these cars being located there, before the explosion —686, did you see it moving around in there anywhere? A. No, sir; I did see it moving over there. I seen it on the main line before the explosion. Q. You saw it on the main line? A. Yes, sir. Q. That was as it came up? Tell what 686 was doing. A. It just came up from down in the south end of the yard. Q. Coming from towards Knoxville? A. Yes, sir; up the main line with the engine and cab. I was on the platform. Q. Do you know where it had left its cars? A. No, sir. Q. Now the engine and cab— A. Came on up the main line and passed the depot, and I don't know where it went after that until after the explosion. Q. After the explosion you saw it over there? A. Yes, sir. Q. Could it have got over there after the explosion? Could it have gone up there, and passed this hole and debris and all, after the explosion? A. No, sir; the tracks were all torn up. Q. That shows you, don't it, that it must have gone before the explosion? A. Yes, sir. Q. It was headed toward Knoxville? A. I don't know. I never noticed. Q. It came along there, this engine and the cab, and you don't know what it had done with its cars? A. No, sir. Q. It had come from Knoxville, hadn't it?

A. Yes, sir. Q. And had dropped its cars somewhere, and came along up here, and you saw it coming up this way? A. Yes, sir. Q. After the explosion you saw it down here? A. Yes, sir. Q. And you say that it couldn't have got there after the explosion? A. I don't see how it could. Q. Unless they carried it in a meal bag? A. Yes, sir."

W. O. Greer, night hostler in the railroad yard, testified as follows: "Q. Where was 686 when you saw it next time? A. 686? I had gotten about half way home, and I heard the blower start, and I looked and saw it in the pit. Q. What is the blower? A. It is something we use to give it draft to clean the fire quick, to keep the smoke from coming out of the door. Q. And you looked, and where was it standing? A. It was standing on the pit. I could see from where I was. Q. Was there any explosion up to that time? Had anything occurred down here at all? A. No, sir. Q. And then you saw it again up here with the blower? A. Yes, sir. Q. Steam, etc., going up high? A. He was cleaning the fire. Q. How would that be? How would he have to have gone to that place, from the time you left him and started home to go to bed? A. There was only one way to come down the main track, and that was to come north down the main track and head in on the pit track. There is only one way to get there." The witness stated that immediately after 680 left the yard he walked about 200 yards to his room, pulled off his shoes, and at that moment the explosion occurred.

W. D. Stanfill, the day hostler in the yard, after stating that he took charge of engine No. 686 upon its arrival in the south end of the yard, and took it to the north end and placed it on the ash pit, testified

as follows: "Q. Where were you at the time of the explosion? A. I was down on the pit cleaning my engine. Q. You were down on the pit cleaning your engine? A. Beginning to shake the grates on the engine."

L. P. Smith testified as follows: "Q. Did you see any other engine come into the yard after the switch engine had gone south (meaning engine 277)? A. Yes, sir; one of them 600's come in. Q. Do you know what become of that? A. Why, they came with the cars in front of it, and the caboose, and put it on one of those back tracks in there. Then they went back towards the south end and came out on the main line, and went up to the north end of the track, and from there went to the ash pit. Q. Did you see any train go out of Jellico with a 600 class engine about then? A. Yes, sir; after Stanfill had pulled in with his engine on the main line, after getting out south, why there was another engine there made up a train with the caboose went out. Q. Another train with a 600 engine went out? A. Yes, sir. Q. How long was that before the explosion. A. Which one was that? Q. The one with the 600 engine that went off after the one that Stanfill took charge of? A. I couldn't say, sir, exactly what time it was. I never paid particular attention to the matter, you understand; but it was some considerable time yet. Q. It passed out of your view there? A. Yes. Mr. Fowler: Yes, of course. By Mr. Smith: Q. Did you see the passenger train pull out—the L. & N. passenger train? A. No, sir; that was at the depot, you see, and I was about 75 yards from the depot, south of there. Q. Was there any switching being done in the yards there after those trains left? A. No, sir; none that I know of, not on the south end."

Andrew Kimbrough, who was unloading coal from a wagon into a car located on the Daisy track, for L. P. Smith, for about 12 minutes before the explosion, testified as follows: "Q. State whether or not any cars or engines were moving in the south end of the yard, or doing any switching, just before the explosion, or while you were on that wagon unloading the coal. A. Well, there wasn't any whilst I was unloading. There wasn't any moving at all. There was an engine went out just as I was coming up to the railroad. Q. What kind of an engine was that? A. It was one of these 600's. Q. Was it attached to a train? A. Yes, sir. Q. Which way was the engine going? A. It was going towards Knoxville."

J. B. Montgomery, a clerk in the station in Jellico, testified as follows: "Q. And you got over there in this seat before the explosion? A. Yes, sir; when I came down stairs the L. & N. passenger train was just ready to leave. Q. Just ready to leave? A. Yes, sir; the engine was blowing very hard, and harder than I thought I had ever heard it, and that attracted my attention, and I looked down; and after I got over there, when I got to these two tracks— the force of habit makes me look both ways to see if an engine is moving or cars moving, and I looked up towards the turntable, and I saw an engine standing on the ash pit, and then right over next to the ash pit another engine, and the L. & N. engine just ready to go out, are the only engines I saw whatever at all. I got across and went to sit down on the seat, and the explosion took place, and knocked me out. Q. Do you remember what engine that was over the cinder pit? A. No, sir; I don't remember. Q. Do

you know whether it was a Southern engine or an L. & N. engine? A. A Southern engine; I don't know what number. Q. Did you notice whether it was one of the large engines or the small ones? A. I didn't notice the number at all."

G. W. Montgomery testified as follows: "Q. In going from the hotel down to the depot, would you pass by an ash pit there where engines are cleaned out? A. Yes, sir; I did. Q. State whether or not you saw an engine on the ash pit. A. I did. Q. Do you know what kind of an engine it was? A. I do not. Q. Do you know whether it was a Southern engine? A. I just don't know."

C. K. Patterson stated that he went to the station at 6:20 a. m. on the morning of the explosion, and while there saw two box cars standing on the tank track, and continued as follows: "Q. What, if anything, was next to them (the box cars) as they stood there on the tank track? A. There was some coal cars. Q. Next to them? A. Yes, sir. Q. In your best judgment how many of those coal cars were standing next to these two box cars? A. I would have to guess at it. I didn't count them. I guess there were seven or eight or ten of them. Q. Seven or eight or ten, somewhere along there? A. Yes, sir. Q. Do you remember who was with you, Mr. Patterson? A. Standing in front of the depot? Q. Yes, sir; if you remember anybody that was there? A. Engineer Witherspoon was there. Q. Engineer Witherspoon? A. Yes, sir. Q. What engine was he handling? A. 686. Q. Before the explosion did you see his engine, 686? A. Yes, sir. Q. Tell the jury where that was. A. Standing back of the depot on the cinder pit track. * * * Q. That had nothing to

do with it.   Was this 686 there after the explosion,
just where it was before?   A..Yes, sir.   Q. Could it
have got there, after that explosion, on account of
the tracks being torn up?'  A. No, sir; it could not.
Q. Where was the 111, still there?   A. Yes, sir.   Q.
Was there any other engine there in that yard?   A.
I didn't see any other engine."

J. J. Roach testified as follows:  "Q. Where was it
(meaning engine 686) the last time you saw it?   A.
It was on the pit after the explosion.  Q. You don't
know, of course, how it got on the pit?  A. No, sir.
Q. You know this—that it must have got to the pit
before the explosion?   A. It couldn't have got there
no other way, because you can't take one over the
turntable, and the tracks were all torn. up here, and
plumb gone. * * *   Q. How long after the explosion
(meaning when he saw the engine on the ash pit)?
A. I guess it was about 10 minutes; something like
10 or 15. * * *   Q. Couldn't they take it around over
the turntable?  A. No, sir; not a 600.  You couldn't
turn a 600 engine on that turntable in a month. Q.
You couldn't turn a 600 engine on that turntable in
a month?   A. No, sir.   Q. Impossible, isn't it?   A.
Very near it.   Q. Isn't it impossible to turn one of
those 600 engines on that turntable?   A. The L. &
N. won't allow you to turn one of them on there;
no, sir."

S. A. McKinney, the .conductor who was on 686,
after stating that he placed the cars he brought into
Jellico on the middle track, and that he went to the
depot to register, said:  "The brakeman took the
engine around down the main line to the pit."

J. A. Witherspoon, the engineer on engine No.
686, stated that he placed his loaded cars on the side

track, and testified as follows: "Q. Now, then, what became of your engine? A. The hostler took her around, and went down the main line, and put her on the pit. Q. What hostler was it? A. Mr. Stanfill. * * * Q. Did you see 686 after it got around on the pit? A. Yes, sir; I saw it on the pit. Q. Where were you when you saw 686 on the pit; that is, down here? A. I was standing up in front of the depot, out there about the tracks somewhere, when the explosion happened."

J. R. Swartzman, fireman on engine No. 686, stated that he saw it on the ash pit before and after the explosion.

L. A. Troutman, night watchman in the yard, stated that he did not know the numbers of the large engines, and continued as follows: "Q. It (meaning an engine of the 600 class) was standing there after the explosion? A. It was standing on the ash pit when I came down to the yard immediately after the explosion; I suppose in 20 or 25 minutes. Q. It was standing there? A. Yes, sir. Q. If it had come up from towards Newcomb, how must it have done to have gotten there? A. Well, if it had gone in from the north end of the yard, it would have had to have gone in before the explosion. Q. Why? A. Because the tracks were torn up on the north end, so it couldn't have got in over them after the explosion. It would have had to have gone in before the explosion. Q. You saw it there after the explosion? A. After the explosion; yes, sir. Q. Did those big, heavy engines use that turntable? A. They used it for a while; but it was against instructions to put those heavy engines on that table any more. Q. For how long? A. It had been a rule for probably

two or three months? Q. For two or three months?
A. Yes, sir.''

J. B. Douglass, the conductor on the passenger
train that started out immediately before the ex-
plosion, stated that when he went from town to his
train he passed two engines in the east part of the
yard, and continued as follows: ''Q. Tell the jury
whether or not you saw any cars on either of these
tracks as you went down. A I don't remember see-
ing any cars. I seen two engines. Q. Engines, I
mean. What engines were they? A. 111 and 686.
Q. What company? A. One was a Southern and one
was an L. & N. engine. Q. Which was the Southern?
A. 686. Q. Where was that standing? A. That was
standing over that cinder pit, or near that point
somewhere. * * * Q. You were in a hurry to get down
there? A. Yes, sir. Q. And you rushed right down
by this engine, and stopped, and looked at the num
ber on it? A. No, sir; I didn't stop. Q. How did
you come to look at the number? A. I looked at it
afterwards as I came up, in a few seconds after the
explosion. * * * Q. When you started home to your
family, you noticed the number of that engine? A.
As I went down I noticed it. Q. Didn't you say a
while ago that you didn't notice the number until
after the explosion. A. I don't know. I didn't pay
much attention to it.''

L. P. Paggett, conductor on Doug's passenger train,
testified with reference to a Southern engine as fol-
lows: ''There came a Southern engine backing down
the track, and I remarked to him (Mr. Cook, 'They
are going to cut us off,' and he hurried them up, and
he followed them down the track and threw the
switch, and by that time we were on the main—our

train—coming right back down the main.   Q. You were not with that train at that time?   A. No, sir; I was standing with him at that time, and he ran out and threw the switch himself, to put his engine on the cinder pit.''

Harrison James, a track repairer in the yards, said that he saw two engines at or near the ash pit about 8 o'clock on the morning of the explosion.

W. D. Cozett, who was at the time of the explosion conductor on a train that took a circus into Jellico about 7 o'clock on the morning of the explosion, and who is now assistant master of trains in the yard, stated that he saw and passed a Southern engine on the ash pit as he went to the depot to register, and continued as follows:  ''Q. Well, which way were you facing at the time the explosion occurred?   A. Facing east.   Q. With your back to the railroad?   A. Yes, sir.   Q. At that time tell the jury whether or not you saw this Southern engine standing on the pit track.  A. Yes, sir; it was there.   Q. How far was it standing from your engine, 111?  A. I should think it was about 25 or 30 feet.   Q. Do you know the number of that Southern engine?   A. No, sir. Q. You didn't notice it?   A. I didn't notice it.   Q. Tell the jury whether or not you heard any rumbling of cars, or rolling of cars, in the yard just before the accident.  A. No, sir; I didn't notice any.   Q. You didn't notice any?  Do you know whether or not there were any engines down in the southern part of the yard at that time?   A. I couldn't say. No, sir; I don't know.''

The following is the testimony introduced by appellants with reference to there being other cars upon the track that the car loaded with dynamite and nitroglycerin was on, which, they claim, prevented the kicking of cars against it:

C. K. Patterson, a conductor on the Southern division of the Clear Fork road, testified as follows: "Q. Now, as you stood there, Captain, it was all open in front of you, you say, and there were some coal cars. First there was a flat car, a box car, and then another box car, and then some six to ten, you don't know how many, coal cars, and then there was an open place. Were there any cars farther up on that track toward the Commercial? A. Do you mean south or north? Q. I mean north. There were two box cars, and from six to ten coal cars, and then you say right in front of the depot there was an open place? A. Yes, sir. Q. Now, at the other end, down at the south end of that track, were there any cars? A. There were 12 or 14 cars down— Q. In that direction? A. Yes, sir."

C. F. Linger testified as follows: "Q. How many box cars were down there that you noticed, if you did notice? A. There were two on that track. Q. And some coal cars? A. Yes, sir; there were two anyway, and might have been three. Q. There were two, and might have been three? A. Yes, sir. Q. Way on down there, on that same track, do you recollect whether there were any more coal cars? A. I don't remember seeing any more coal cars. There were two or three more box cars, as well as I remember, still on farther south on the same track."

L. A. Troutman testified that about 25 minutes after the explosion he saw two or three cars on the track next to where the explosion occurred, then a space of some distance, then four or five more cars, but did not notice any other cars farther south on the track. Another witness, a lumber dealer, whose place of business was west of the yard, stated that he

went over the yard early in the morning before the explosion looking for a car of lumber that he had received a bill for; that he noticed the car loaded with the dynamite and nitroglycerin, as he thought, with two or three others coupled to it; that the best of his recollection was that he saw two or three cars in the south end of the yard.

J. D. Hayden, roadmaster for the Louisville & Nashville, and who resided in Knoxville, Tenn., testified that he arrived in Jellico on the morning of the explosion between 10:45 and 11 o'clock; that he found two steel cars near the place of the explosion, one of which was badly damaged; and that he found ten other cars situated on the same track at different points.

W. F. Robertson, station agent in Jellico, testified, in substance, to the same facts.

Appellants introduced a photograph of the tank track, showing some cars on it. The picture was taken by S. S. Douglas about the middle of the afternoon of the day of the explosion.

As to the third proposition, to-wit, that the dynamite and nitroglycerin was caused to explode by Walter Rogers shooting into it with a 22 rifle, all the witnesses who testified upon the subject for either party testified that the car containing the explosives was situated north of the station, on the west side of the main line; that Walter Rogers and John Swafford were at a point west of the main line, near to it, and fired two or three shots at a small contents card tacked on the door of the car about midway between the floor and the roof of the car; that this occurred some 12 or 15 minutes before the explosion; that just before the explosion Rogers, Cook, the master mechanic

in the yard, and Joe Sellers, engineer for the Proctor Coal Company, were seen talking together on the east side of the main line at a point from 25 to 50 feet from the car containing the explosives; the witnesses varying as to the distance. There was no testimony showing that there was but one shot fired after the shots above referred to. The only witnesses testifying upon that subject were John Swafford, introduced by appellants ,and J. A. Carson, introduced by appellee.

Swafford testified as follows: "Q. State whether or not you saw any shots fired then as you passed them, or soon after you passed them, as you were pulling out. A. As it backed down or pulled out. Q. As you were pulling out? A. Yes, sir. Q. How many shots did you hear fired? A. I saw one. Q. Who fired that? A. Walter Rogers. Q. How far was he then from the car? A. He was between the main track and the car. He was about the same place. Q. He was between the main track and the car? A. He was between the main track and the car, and I don't know exactly what point he was at; but he was between the main track and the car. Q. How far did that put him from the car? A. It put him anywhere from 10 to 20 feet. Q. Where was Cook? A. He was right there beside. All three were standing there side by side. Q. Did you see more than one shot fired? A. No, sir. Q. In what direction did he point his gun, with reference to the car, toward or away from it? A. Toward it. Q. In what direction was his face turned? A. Right toward the car. Q. How long after that before the explosion happened. A. Anywhere from one-half a minute to a minute and a half, something like that; a minute anyway. Q.

Where were you?   A. I was on the rear platform of the train.   Q. As your train pulled out pretty fast? A. Yes, sir. * * *   Q. In what position did Cook have that gun, holding it, when you last noticed him— Rogers I mean?   A. He had it something like this'' (holding gun with barrel pointing slightly upward). Then he explained that the gun would be held in that position to reload it.

J. A. Carson, after stating that he saw Rogers, Cook, and Sellers on the east side of the main track immediately before the explosion, that Rogers shot at something under the Jung Brewing Company's ware- house, and that all three of them squatted and ap- peared to be looking under the brewery, continued as follows: ''Q. Now, give the best impression you can, Mr. Carson, to the jury, how many minutes' time, about how long it was, from the time they shot under the brewery—seemed like shooting under the brewery—till the explosion?   A. Well, it was about, it seemed to me like—   Well, I just turned around there when Walter Rogers shot.   I turned around there, and looked and seed him, and seed Sellers. He went around one way and Cook the other.   I turned around, and they all squatted down there, and I just turned back, and went to cleaning my fish, and just about that time it went off.''

H. L. Hall stated that he had made a test of the strength of a 22 rifle similar to the one used by Rogers, and continued as follows:   ''Q. I wish to know, Judge Hall, as to what depth or penetration your gun will—   Have you tried to see how far it will go into wood?   A. This 22 rifle?   Q. Your little gun, the sister of this.   No; this is yours?   A. Yes,

sir. Q. Now, how far will that drive one of these
Union Metallic bullets into the wood? Have you ever
tried it? A. Yes, sir; I tried over there at Knoxville
shooting through a car door, and a box of dynamite
was shipped in was setting behind the door. Q. Was
that a standard Pennsylvania dynamite car door?
A. They claimed that it was; yes, sir. They claimed
that it was a Pennsylvania car door. Q. Judge Hall,
you shot through what they claimed to be a Pennsyl-
vania car door? A. Yes, sir. Q. And beyond that
you say was a high explosive, dangerous dynamite
box? A. Yes, sir. Q. How far did you stand away
with it? A. Twenty-eight feet. Q. Was that your
gun? A. Yes, sir. Q. With Union Metallic cart-
ridges? A. Three of them Union Metallic and three
of them Peters'. Q. You tried both sorts? A. Yes,
sir. Q. Did the first of them go through? A. Yes,
sir; all of them went through the door and
through the box. Q. Is that the box? Look
at that (handing witness box which had
been exhibited to the jury). A. It looks like it. It
is marked just like we marked it over there where
we were shooting at it. Q. Show the jury just where
those bullets went through. A. You can see where
they went through and where they come out from
the way it looks there. Q. Where did they go in?
A. They have been turned around, some went in one
way and some the other, and some through the end.
Q. You tried it both ways? A. Yes, sir.''

Appellee introduced the following testimony, which
rebuts that of appellants upon this point:

Jack Burns testified as to the construction of a
dynamite car, stating that the outside of the car is
made of hardwood one inch thick fastened to two by

four upright braces; that on the inside, and nailed to the braces, is a wainscoting of hardwood one inch thick, and four or five feet high, which would extend above the two layers of dynamite and nitroglycerin. The sides and ends of the boxes containing the explosives were each about one inch thick, and the boxes were set four or five inches from the wainscoting. So the ball fired from the 22 rifle, before it could have caused the explosion, would have had to pass through hardwood an inch thick, then a space, then through another piece of hardwood an inch thick, then through another space of four or five inches, and then through the side or end of one of the boxes containing one of the explosives, which was also an inch thick. The witness stated that a 22 rifle did not have sufficient power to shoot a ball through these.

The witness S. S. Trammell testified that he made a test of the strength of a 22 rifle, such as was used by Rogers, by firing six shots at a pine box, each side of which was seven-eights of an inch thick, and that the balls went through one side, and made a slight dent in the other, and dropped to the ground.

The following testimony was introduced by appellee to show that no cars were on the track, south of the car that exploded, up as far as the Commercial Hotel, except the pig iron car and the two big steel cars, which appellee claims were shunted against it:

W. S. Harkness testified as follows: "Q. Then what did you do after that? A. I went to where the explosion occurred. Q. Did you see any cars that were torn to pieces? A. Yes, sir; I saw three cars, that I remember, right up against the exploded hole on the same track. Q. What kind of a car was nearest

the place of explosion? A. Pig iron and pieces of cars, and the next was an empty steel car, with the end driven in. Q. How many cars from there south on the same track? A. There were no cars on that track from the Commercial Hotel to the point of explosion, except the cars standing at that place, and they were three in number, a steel car, a box, and another. * * * Q. How many cars did you see near the place of explosion on the same track? A. I think there were three. Q. Did you look down the track to see if there were more than three? A. Yes; I looked down the track and could still see the engine. Q. Down the track that the dynamite car was on? A. Yes, sir; standing down there, still standing down there, with the one that brought us from the ice factory.''

Joseph Giles, fireman on the Proctor Coal Company's engine, stated that about 6:35 or 6:40 o'clock on the morning of the explosion he backed the engine in from the north end of the yard, coupled onto the car containing the explosives, pulled it out with nine empty coal gons, which were coupled to it, moved north, cut the nine gons off, and kicked them onto the Proctor track, and pushed the car containing the dynamite and nitroglycerin and probably another back on the track where he found them, and that there were no other cars on that track at that time, and continued, in answer to a question as to whether or not there were any cars on the tank track, as follows: ''A. There was nothing; no, sir, I went up the tank track, and stopped right here, and hopped off of my engine, and went off over here, and hit the tank track, and went across over here, and went to the show cars. Q. Was that before the explosion?

A. Yes, sir; 15 or 20 minutes before the explosion. Q. And you say there was nothing on that tank track before that? A. No, sir; nothing at all. Q. You say there was nothing here? · A. I won't say there was nothing on the north end. I went up the south end."

Jack Burns testified that the tank track was clear from the car containing the explosives to the south end of the yard before the explosion; that after the explosion there were remains of a box car and two steel cars near where the explosion occurred.

Jack Kincaid, after stating that the car of explosives was 300 or 400 yards from the depot, testified as follows: "Q. Now, were there any cars between the depot and this dynamite car before these two coal cars loaded with pig iron came down against the dynamite car? A. I did not see any. There was not any on that track but the two coal cars."

It thus appears that the evidence on all three of the propositions is very conflicting. It is contended that a camera cannot "lie," and that therefore the photograph showing cars at intervals on the tank track after the explosion is conclusive of the fact that the cars were there, and that they rendered it impossible to shunt cars onto that track and cause the explosion. It must be remembered that this picture was not taken until about the middle of the afternoon, after the explosion at 8 o'clock in the morning; that there had been, during the time intervening, three engines in the yard, either of which, in its regular course of duty, could have placed these cars there; nor is it shown, positively, that the car containing the explosives was on the tank track when the explosion occurred. The engineer who coupled onto the car last at about 6:30 o'clock says he either

placed it back on the tank track, or on the middle track; but he was not positive which one. It is contended, however, that it must have been on the tank track, as it was at the center of the hole made by the explosion. This is a strong reason for presuming that it occupied that position, but it is not conclusive. There is no accounting for the peculiar things that may be made to appear from the explosion of 400 boxes of dynamite and 50 boxes of nitroglycerin when contained in a car. If the car had been of equal strength on each side and end, and the explosion of the substances in all the boxes had occurred at the same time, then it would be almost certain that the car set above the center of the hole; but if the sides and ends of the car were of unequal strength, and the explosion of all the boxes had not occurred at the same instant, then it is barely possible that the center of the hole would not be exactly under the place where the car set.

Nor was it impossible for the explosion to have been produced by kicking of cars against it, even though there were other cars on the same track. The yard is slightly downgrade from the south end to near the car containing the explosives. It was not impossible to have kicked with an engine a car or cars in the south end of the yard against the intervening car or cars on the line which would cause it to start downgrade and the first to stop, and so on until the car nearest the car loaded with the dynamite and nitroglycerin would be made to collide with it and produce the explosion. This can be understood by all who have seen one solid body roll against another and strike on center. The first will instantly stop and the other start. If the cars were upon the track as

claimed by appellants, there is no other way to account for the collision. It was the peculiar province of the jury to hear and weigh the evidence and determine the truth of the matter. In finding for appellee they must have believed from the evidence that there were no cars on the south end of the track in the way of shunting cars against it, or that they were shunted in the manner above stated. The jury was compelled to come to one of these conclusions, or say that they did not believe the evidence of 14 "eyewitnesses."

The jury heard and determined the evidence on the question of the rifle shot causing the explosion against appellants' contention, and, in our opinion, their finding was not against the weight of the evidence, for it rather preponderates in appellee's favor. Of course, the last shot that Swafford saw Rogers fire, which was about 1½ minutes before the explosion, did not produce the explosion. Carson says that this shot was fired at some object under the brewery. It is also exceedingly doubtful whether the little target gun had sufficient penetrating power to reach the dynamite and nitroglycerin and cause them to explode. Appellants would have this court say the verdict of the jury is flagrantly against the evidence, when it is founded upon the testimony of 14 "eyewitnesses," corroborated by at least that many more, who testified that the explosion was caused by the shunting of cars against the car loaded with the dynamite and nitroglycerin, because witness Swafford testified that the last he saw of Rogers he had his target gun in a position to load it, that therefore it is inevitable that he loaded it and fired at the car, and that the ball penetrated to the

dynamite or nitroglycerin and produced the explosion, when the preponderance of the proof shows that it could not have done so.

This leaves only appellants' first proposition to be considered, which is that there was no engine in the south end of the yard that could have kicked cars against the car loaded with the explosives. As will be seen from the testimony referred to, appellants introduced much testimony tending to support their position that engine No. 686, was at the time of the explosion, upon the ash pit track which is on the east side of the yard. As conclusive evidence that it was there before the explosion, it was shown that the ash pit track was torn up by the explosion at a point between the ash pit and the north end, which rendered it impossible, after the explosion, to place this engine upon the ash pit; there being a turntable between the south end of the track and the ash pit which was too weak to hold one of these large engines. After appellants had progressed with their evidence and this theory for a time, it was developed that this engine, No. 686, had the day of the explosion, about 1 p. m., been taken out over this turntable. After this it was conceded that this turntable would hold the large engines, but contended that it was a great deal of trouble to get one of them across it.

Appellants' contention is that engine No. 686 arrived, according to the train sheet, at 7:35 o'clock on the morning of the explosion, and that the explosion occurred at 7:47 o'clock, thus giving the engine 12 minutes to place its loaded cars on the sidings, recouple to its caboose, and go to the north end of the yard, throw a switch, and run back to the ash pit. It may be true that the engine would have

had time to do these things if the train sheets were correct; but it must be remembered that they are no more infallible than the men who made them. See the opinion of this court by Judge Hobson in the case of ———— .v. ————, 117 S. W. ——. In that case appellee won in the lower court on the time of his train as given by appellant's train sheets, but lost in this court because appellant showed by the testimony of the train crew that the time given in the train sheets was wrong. There must be some error as to time of arrival of No. 686, or as to the time of the explosion, or some engine not accounted for by the train dispatcher was in the south end of the yard, or 25 or 30 witnesses have sworn falsely. As before stated, the conductor's register, kept in the Jellico station, and which was made out by the conductor of 686, shows that that engine arrived in Jellico at 7:40 o'clock. This would give the engine only seven minutes to do the work required of it and get into the ash pit. Nor is it by any means certain that the explosion occurred at 7:47 o'clock. How easy for an error to occur as to this! The explosion wrecked the station and most all the town, killed many, wounded over 100, and dazed and rendered unconscious for a short time all others. Under such circumstances it is natural for one to forget to notice the time.

Under the instruction, the jury was compelled to believe from the evidence, before it could find for appellee, that the explosion was caused by an engine, not only kicking cars, but doing so with great, unusual, and unnecessary force, against the car containing the dynamite and nitroglycerin. The jury found in favor of appellee, and their verdict is abun-

dantly supported by the evidence. It is true that there was much testimony introduced by appellants tending to contradict that of appellee; but the jury saw the witnesses, and their demeanor and appearance, and were in a much better position to arrive at a just conclusion than this court. The Constitution gave to the parties a right to a trial by a jury, and this court should not reverse the judgment, as the appellants had a fair trial; no errors having been committed against them by the lower court. Many circumstances may be found in the 1,800 pages of evidence in this case which tend either to support or defeat the contentions of both appellee and appellants, and which we deem it unneecssary to refer to.

The case of Howard v. Louisville Ry. Co., 105 S. W. 932, 32 Ky. Law Rep. 309, was one where appellant sued for damages for personal injuries. She alleged that appellee's servants started the car by giving it an unnecessary and violent jerk, which caused her injuries. She introduced three witnesses who sustained the allegation of her petition. Appellant did not introduce any direct evidence to the contrary; but the jury seemed to have disregarded the statement of her witnesses and found against her. In considering the case on appeal this court said: "In trials by jury it does not follow that because one or more witnesses testified positively concerning a fact, and there is no evidence to the contrary that the verdict must be flagrantly against the evidence. The number of witnesses who testify to a fact is not necessarily a controlling feature in determining its truth; neither does the fact that their evidence may not be contradicted by word of mouth compel its acceptance as true. The jury have the

right to disregard the whole or any part of the testimony of any witness, and it is their province to give such weight to the evidence as in their judgment and discretion it is entitled to. In considering the weight to which evidence is entitled, and the credibility that shall be attached to the words of the witnesses, the jury may, and often do, take into consideration the demeanor, appearance, and the manner of the witness, and from these and other circumstances that come under their observation during the trial may conclude that the witness is not worthy of credit, or is not testifying to the truth, and disregard his entire testimony. We do not, of course, intimate that appellant or the witnesses who testified in her behalf were not telling the whole truth, but only express the opinion that the question of what weight, if any, shall be given to the testimony of a witness, is peculiarly within the province of the jury. The fact that neither appellant nor the persons in company with her made any complaint to the persons in charge of the car was a potent fact that no doubt largely influenced the finding of the jury. There is no evidence whatever indicating passion or prejudice on the part of the jury. Indeed, it is highly improbable that a jury should be biased in favor of the defendant in a suit against a corporation by a woman, or predisposed to return a verdict against her. But, whatever induced them in the face of this evidence to disregard it, we are not disposed to interfere with their conclusion. Every person who has had experience in the trial of jury cases knows that the court, the jury, as well as the attorneys, give close attention to the manner of the witnesses while testifying, and their demeanor in the courthouse,

and are sometimes more strongly influenced and impressed by appearances than they are by the words of the witnesses; and so it is that appellate courts, who do not see the witnesses, and have no opportunity of forming any conclusion from their appearance or conduct, are reluctant to interfere with the findings of those who do see them, and have the right to consider what they see, as well as what they hear, in making up their decision. A stronger impression may be made on the juror's mind by what he sees than by what he hears. A juror can see as well as hear, and has a right to use his eyes as well as his ears in making up his mind as to what weight, if any, shall be given the evidence of a witness.''

This court has often enunciated this rule. This court was established for the purpose of seeing that parties have a legal trial, a trial according to legal principles, but not to weigh the evidence. That duty belongs to the jury, and this court should never disturb their verdict, when no errors have been committed by the court, except in extreme cases. We are of the opinion that there is sufficient testimony to support the judgment in this case; i. e., that the explosion resulted from the violent kicking of cars against the one containing the dynamite and nitroglycerin.

We are of the opinion, however, that the court erred to the prejudice of appellee in confining his right of recovery to that single issue. He should have, also, been permitted to recover if the jury believed from the evidence that appellants negligently placed this car, loaded with dynamite and nitroglycerin, in its yard in the city of Jellico, for the space of 11 hours, without taking any steps to guard

it against intruders, treaspassers, fun seekers, or
the fickle-minded.  The demands of commerce should
be made subservient and held in check to some extent,
at least, to the rights and lives of unsuspecting and
innocent human beings.  It appears to our minds
that these propositions are self-evident. · The mere
statement of them impresses the mind that they are
correct.  There is abundant evidence in the record
upon which to base such an instruction, and very
much law to support it.  The testimony shows that
the car of explosives was placed in the yard at 8
o'clock p. m., and remained there until near 8 o'clock
of the 21st.  No person knew that it contained ex-
plosives, except the depot agent and the conductor,
Yerkes, both of whom left the yard soon after the
car was so placed.  No guard or guards, or notice of
any kind, was placed at or near the car to warn per-
sons of the danger; indeed, no care of any kind was
used to prevent an explosion.  Appellants' own em-
ployes, without warning or notice of the danger, were
permitted to couple to and move the car about the
yard during the night.  There was no card or poster
placed on the east side of the car showing that it con-
tained explosives, except a little "contents" card.
The proof was conflicting as to the other side and the
two ends.  Such absence of care in handling so dan-
gerous a substance is certainly actionable negligence.

In early times a common carrier was not bound
to receive for transportation dangerous articles,
such as nitroglycerin, dynamite, and gunpowder,
unless there was some statutory provision requiring
it, and those who undertook to transport them did
so at their own peril.  3 Wood on Common Carriers,
Sec. 113; 2 Rorer on Railroads, Sec. 1231; New York

C. R. Co. v. Lockwood, 17 Wall. 357, 24 L. Ed. 627; Lake Shore & M. S. R. Co. v. Perkins, 25 Mich. 329, 12 Am. Rep. 275. But on account of the demands of commerce, and the great necessity for the use of such articles in the development of this country, the rule has been relaxed in America. In 12 Am. & Eng. Ency. Law, p. 500, it is said: "According to the rule generally recognized in the United States, a person in the lawful possession or use of an apparatus or substance liable to explode is not responsible for damages resulting from its explosion to the person or property of another, unless there be some fault or negligence on his part. Perhaps in England the liability of one who keeps dangerous substances which explode and cause injury is not dependent upon his negligence." The author cites many cases to support the rule. It thus appears that if one handling explosives in this country takes the necessary precautions in endeavoring to save others from injury by the explosion of it, he will not be responsible in damages; but it appears that the rule is otherwise in England.

It is stated in 19 Cyc. p. 6, that the same degree of care is required of those transporting explosives or combustible oils as is exercised by merchants and those handling them, and many authorities are cited to sustain the rule. In the case of Heeg v. Licht, 80 N. Y. 579, 36 Am. Rep. 654, the court said that an individual has no more right to keep a magazine of powder upon his premises, which is dangerous, to the detriment of his neighbor, than he is authorized to engage in any other business which may occasion serious consequences. In the same case the court said that in Myers v. Malcolm, 6 Hill (N. Y.)

292, 41 Am. Dec. 744, it was held that the act of keep-ing a large quantity of gunpowder insufficiently se-cured near other buildings, thereby endangering the lives of persons residing in the vicinity, amounted to a public nuisance, and an action would lie for dam-ages where an explosion occurred causing injury. In the case of Wilson v. Phoenix Mfg. Co., 40 W. Va., 413, 21 S. E. 1035, 52 Am. St. Rep. 890, it was decided that the owner of a powder mill or nitroglycerin works was liable for all damages done to persons or property by the explosion of the plant, whether negli-gence was the cause of the explosion or not, if it is so located that such an explosion is likely to involve in-jury to persons or property of third persons. In that case the court said: "Powder and nitroglycerin are commodities of essential, if not primary importance, from their wide use in war and in the construction of railroads, roads, buildings, and other varied uses; and their manufacture is a business entirely respect-able and indispensable. But that consideration is not all-controlling. That consideration is not alone to be regarded. The rights and safety of those not engaged in their manufacture must not be forgotten. They are agents of magical power and wrath. When the spark or touch of ignition meets them, their subtle force is awakened to instantaneous action—an action giving no warning, and so potent that almost in the twinkling of an eye, before thought of self-preservation can come, it wastes man and his home and his savings with irrepressible energy. Often the explosion comes from causes not discernible, which reasonable foresight or prudence cannot see. Valu-able as are these giants as auxiliaries to man in his

great works, they must be limited to places and bounds of safety.''

The case of Ft. Worth & D. C. Ry. Co. v. Beauchamp, 95 Tex. 496, 68 S. W. 502, 58 L. R. A. 716, 93 Am. St. Rep. 864, is a case in point. In that case a car loaded with black and giant powder was delivered in the yard of appellant in the city of Bowie, Tex., and at a place upon the transfer switch in charge and under the control of appellant, the Ft. Worth Railroad Company. It was permitted to remain there until the morning of April 5th, when another car near it was set on fire, supposedly by a tramp, which caused the powder to explode and destroy the house of appellee, Beauchamp, which was situated about 800 yards distant. The lower court gave a statement of its finding of facts, in which it is said that the car containing the powder stood about the center of the switch and within a radius of one-fourth of a mile of some 40 residences, and within a radius of three-fourths of a mile of the greater portion of the residence and business portion of the city, the city having a population of about 2,600 people, with a public road running within a few feet, and with the main line of defendant within about 20 feet, and that of the Chicago, Rock Island & Texas Railway within about 200 feet, of where the car of powder was permitted to stand, and, further, that there was scheduled to pass this point, upon the two roads, 16 trains daily, besides extras. The lower court further found that defendant placed no guard or watch about the car of powder, that its contents were known to the agent, who receipted for the car, and that there was placarded upon the walls of the car the following, viz.; ''High Explosives

Handle With Care." The Supreme Court of Texas, in passing upon these facts, said: "But a nuisance may result from the negligent exercise of a right of performance of a duty with respect to one's own property or property in his charge. 1 Wood, Nuis. § 4, and notes. A nuisance to others may thus arise from the careless discharge by a common carrier of its duty in the transportation of such dangerous articles as are here in question. The right to carry them does not include the right to subject persons along the route to dangers from explosions for a longer time or in a greater degree than is reasonably necessary to the proper performance of the carrier's duty. This is an obvious deduction from plainest principles. If, therefore, the car was unnecessarily and unreasonably delayed at the place where it exploded, so as to subject plaintiff's property to such danger for a longer time than would have attended a transportation made with reasonable dispatch, such keeping of the car at that place was a nuisance. The case thus supposed would not differ essentially from those of other keepers of dangerous explosives; or if ordinary care was not exercised by the appellee in keeping and caring for the car, and the absence thereof gave rise to a degree of danger such as would have been avoided by the exercise of it, such negligence would make the presence of the car so negligently kept a nuisance." To the same effect is the case of Henry v. Cleveland Ry. Co. (C. C.) 67, Fed. 426.

In the case at bar the car containing the explosives was within 150 yards of the main portion of the city of Jellico. Many persons lived and performed labor all around the place it was located. It is proved, without contradiction, that within 20 feet of where the car

stood was a common shooting ground, where persons shot at marks and turkeys for general amusement, which fact was known to appellants, and had been for years. It is conceded that no guard or watch was placed at or near the car, and that its contents were made known to appellant's depot agent in a moment or two after it was placed upon the track. It is virtually conceded that the car was not placarded on the east side with the words: "High Explosives. Handle with Care." However, the proof is conflicting as to whether there was any such card on the other side and ends. The proof showed that such cards were on each side and end when it left Emporium, Pa.; but some of them, at least, appeared to have been lost while the car was in transit. In Thompson on Negligence, vol. 1, § 750, it is said: "That the dangers to be apprehended in handling highly explosive substances is so great and obvious that a high degree of care should be taken to prevent them from falling into the hands of others." We understand the author to mean that strangers should not be allowed to have access to them; that they must be guarded and protected and safely kept. In 1 Addison on Torts, 511, it is said: "It appears to us that a man who lives in a public place, along which persons have to pass a dangerous machine, which may be fatal to any one who touches it, without any precaution against mischief, is not only guilty of negligence, but of negligence of a very reprehensible character." It will be seen from these authorities that appellants are responsible for the damages resulting from the explosion, and it matters not what caused the explosion, if they failed to exercise care to prevent it.

The rules established by appellants, defining the precautions to be used in the transportation and care

of explosives, contain the following: Subsection B of rule 23, in part, is as follows: "Conductors must frequently inspect such cars to see that the carding is intact. When any of these cards become detached or lost in transit, the conductor will give notice thereof on arrival at the next district terminal yard to the yardmaster, or other person in charge, who must attend at once to recarding the cars as required." Subsection C of the same rule is as follows: "At points where trains stop trainmen must examine cars carded as containing explosives and adjacent cars to see if they are in good condition and free from hot boxes or other defects liable to cause damage. If cars are set off short of destination from any cause, the conductor must notify the nearest agent, who must see that every precaution is taken to prevent accident. The conductor must also notify the superintendent from the first telegraph office." There is no pretense that these rules were complied with while the car was in the yard at Jellico. The destination of the car was a mining town about five miles from Jellico; and, from the proof, there was no precaution taken by any one to prevent the accident. In failing to take this precaution, appellants were guilty of negligence; for it is known by all men, who know anything upon the subject, that dynamite can be exploded by a jar, and that nitroglycerin is more sensitive than dynamite and extremely unstable and terribly explosive.

For these reasons, the judgment of the lower court is affirmed.

LASSING, J. (dissenting). George M. Adkins was killed by the explosion of dynamite in the railroad yards at Jellico, Ky., on the morning of September 21, 1906. The yards there are used by both the Louisville & Nashville Railroad and the Southern Railway; Jel-

lico being the terminal of each road. A. C. Cox, ad-ministrator of said Adkins, sued both companies to recover for his death. He charges that the defendant companies, or one of them, negligently shunted a car against the car containing the dynamite with such force as to cause the dynamite to explode. Each of the companies denied liability, and a trial upon this issue resulted in a verdict in favor of the plaintiff for $7,500. Many reasons are assigned, why the judgment should be reversed, chief of which is that the verdict is flagrantly against the evidence.

This car of dynamite had been shipped from Emporium, Pa., and arrived in the yards at Jellico, over the Southern Railroad, at 8:30 p. m., September 20th. It remained there over night, and at 7:47 on the following morning the explosion occurred. Plaintiff proved by the testimony of several witnesses that they saw an engine shunt a car or cars against the car containing the dynamite, and that immediately or shortly thereafter the dynamite exploded. He also proved by several witnesses that they heard the noise of the impact when a car or cars were shunted against another car or cars, and that shortly thereafter the explosion followed. The defendants insist that explosion was not caused by the shunting of a car against the car of dynamite, but by a man named Rogers shooting into the car with a rifle. They proved by the testimony of several witnesses that this man and others had been shooting into the dynamite car before the explosion occurred, and that just immediately before the explosion he was seen to raise his rifle again as though to shoot. They also proved that a rifle of the make and caliber used by Rogers has sufficient penetrating force to go through a plank of similar material and thick-

ness as the door of the car, and through a dynamite box, and explode the dynamite in the box. Several expert witnesses were introduced, who testified that dynamite, when properly packed, could not be exploded by shunting one car against another, unless the coupling of the car was broken and driven into the dynamite box, or, in other words, unless the force of the impact was great enough to wreck the car, and that even then, unless some metallic substance was driven violently into the dynamite, it would not explode; that they had seen dynamite cars wrecked, and no explosion occur. Defendants' testimony shows that the dynamite in this car had been carefully pack ed for shipment after the most approved fashion, and that as packed it was perfectly safe for shipment, and could not have been exploded by the ordinary and usual jar and jostling which a car would receive in being hauled over the road, or by other cars being shunted into the dynamite car with a less degree of force than that indicated. In its shipment from Emporium, Pa., to Jellico, this car had passed over the lines of the Pennsylvania, the Norfolk & Western, and the Southern Railroads, traversing the States of Pennsylvania, Virginia and Tennessee. During the course of this journey it must necessarily have been hauled by different engines, and taken out of one train and put into another at least three or more times. There is no proof whatever that when it reached Jellico the car was not intact and in perfect condition. It was properly labeled, showing its contents. It appears that a part of this load of dyna mite was to be taken out of the car at Jellico, and the remainder shipped on to another point; and this is the reason given for the car's remaining there in the

yards over night rather than being continued on to its destination.

Complaint is made because this load of highly explosive substances was brought into the yards and permitted to remain over night there without being guarded. The trial judge was evidently of opinion that this act on the part of the company or companies was not, in itself, negligence; and in this conclusion I concur, for the proof shows that, as packed, the dynamite was perfectly safe for shipment. Besides, no amount of care on the part of the companies in the handling of the car could have prevented the explosion if it was produced by the rifle shot; and if it was not, the necessity for such care is wanting. As plaintiff's witnesses did not identify in any way the engine which they said shunted the car that did the damage, defendants undertook to show, from the location of every engine that had been in or about the yards within the hour just previous to the explosion, that it was impossible that a car could have been shunted against the dynamite car, as alleged. They also attempted to show, from the position of freight cars upon the track upon which the dynamite car was standing, that it would have been impossible for the explosion to have been produced in the way and manner in which the plaintiff claims it was. In order that the location of the engines and cars, as fixed by the various witnesses, may be understood, it becomes necessary to describe the yards and tracks at some length.

The yards at Jellico lie partly in Kentucky and partly in Tennessee. The northern part is in Kentucky, and the southern part in Tennessee. The Louisville & Nashville Railroad trains, in coming into and going from the yards, use the northern end, and the

trains of the Southern Railway use the southern end.
The surface is comparatively level, there being only
a slight dip from either end of the yards toward the
center.  A car will stand upon any part of the tracks
without the necessity of having the brakes applied.
To the east of the depot are two tracks, on
one of which is the "cinder pit."  To the west
of the depot there are seven tracks, and nam-
ing these tracks, going west from the depot, we
have, first, the house track; second, the main track;
third, the middle track; fourth, the tank track; fifth,
the side track; sixth, the sand track; and, seventh,
and at some distance further west, the Proctor Coal
spur track.  The car containing the dynamite was on
the tank track, not far from the Tennessee State line.
From the testimony of all of the witnesses it is plain
that, if a car was shunted into the dynamite car, it
came from the south; and this is made evident by the
further fact that after the explosion no car or part of
a car was found north of the spot where the car of
dynamite stood.  Defendants proved that just after
the explosion there were four cars on the tank track
immediately south of the hole made by the explosion
of the dynamite car.  Following the tank track south
a distance of about 50 feet, there were six cars stand-
ing upon the tank track.  Further south, and beyond
the six cars, this track divides.  On the eastern por-
tion, which is, in fact, a continuation of the tank track
proper, there was a space of 261 feet to one car, then
27 feet to four cars.  On the western or spur branch
of the tank track, there were three cars, none of
which were joined together.  That these cars on the
tank track were located as claimed by defendants is
abundantly proved by their witnesses, and not se-

riously contradicted by the testimony of the witnesses
for the plaintiff.

It is argued with great earnestness for the defend-
ants that the number and location of the cars on the
tank track and its spur completely refute the testi-
mony of plaintiff's witnesses as to what caused the
explosion, for none of them say that there were more
than three cars attached to the dynamite car, or that
more than three cars were shunted into the dynamite
car; whereas, by actual count, there were shown to
be fifteen cars on this track, south of the wrecked
dynamite car, figuring those on the eastern end of
the tank track, and thirteen cars, counting those on
the western end. So that, there must have been not
less than thirteen cars pushed by the engine that
shunted the car into the dynamite car; whereas, no
witness introduced by plaintiff places the number at
more than six. There is no conflict in the record as
to what engines were in or near the yards within the
hour just previous to the explosion. These were the
L. & N. engine known as "Doug's Engine," L. & N.
engine No. 111, the Proctor Coal Company's engine,
Southern switch engine No. 277, Southern engine No.
680, and Southern engine No. 686. These last two
named were extra large freight engines. Defendant's
witnesses testify that these six were all of the en-
gines that had been in or near the yards within the
hour just previous to the explosion. That their testi-
mony upon this point is true is strengthened by the
fact that no one testifies to seeing any other engine in
or near the yards during this time. The explosion so
tore up the track as to render all of the tracks north
of the point where the explosion occurred impassable,
either by being warped and thrown out of line or else

by being blocked by earth and debris. Extending south from the yards is a single track, over which any engine leaving the yards would have to travel. The noise of the explosion aroused the railroad men and others at Newcomb, about three miles south of Jellico, and a lot of men started immediately for Jellico on a handcar. They found the track clear between Newcomb and Jellico; hence no engine left the yards going south after it occurred. Many persons walked from the south up this track to the scene of the explosion, and none of them encountered any engine leaving the yards. As no engine left the yards after the explosion, and no witness testifies to having seen any other about there within the hour next before the explosion, one must conclude that the six engines above named were all that had been or were there within the time named.

Defendants have undertaken to account for the location of each of these engines. The L. & N. engine known as "Doug's Engine" was attached to a north-bound passenger train which had pulled out of Jellico just a few minutes before the explosion. It is conceded that this engine shunted no car against the car of dynamite; and could not have caused the explosion. The Proctor Coal Company's engine was standing over on the coal company's switching track, and, from its position and the fact that it was not then being used, it must be excluded from consideration. L. & N. engine No. 111 is shown by the testimony of witnesses, both for plaintiff and defendants, to have been at the time of the explosion, standing over east of the depot near the "cinder pit," on the track known as the "old man's track." It was proven to have been there before the explosion, and was there after

the explosion. Its fire had been "drawn," and it was, in railroad parlance, "dead." Southern switch engine No. 277 had left the yards at about 7 o'clock, and taken a load of empty cars down to the Blue Gem mines, some miles away, and was there at the mines at the time of the explosion, as is shown by the testimony of many witnesses, most of whom are wholly disinterested, so far as any connection with either railroad is concerned, and one of plaintiff's witnesses testifies to this state of fact also. Southern freight engine No. 680 left the yards with a train of cars at 7:35, or 12 minutes before the explosion, as is shown by the testimony of many witnesses, and at the time of the explosion was more than three miles south of Jellico. Eight or ten witnesses testified to seeing this engine with its train of cars near Newcomb at the time they heard the explosion. Southern freight engine No. 686 is shown by the testimony of a great number of witnesses, some for plaintiff and some for defendants, to have been on the "cinder pit," on the track east of the depot. This is a large engine, and had come into the yards from the south some time early in the morning, discharged its train of cars, and had been taken over on the "cinder pit." To get on this "cinder pit" it either had to go through the yards, past the dynamite car, to the northern limits of the yards, and then back up on the "cinder pit" track, or else it had to go to the southern limits of the yards, and over the switch to the turntable, and over the turntable to the "cinder pit" track. While the proof shows that this engine could be passed over the turntable, yet it is quite difficult to have it do so on account of its size. The easy, natural, and usual way to get to the "cinder pit" is by the northern route;

but, as the explosion blocked this way, if it was taken to the "cinder pit," after the explosion, it must have been over the other way. No possible reason is assigned for taking it there after the explosion occurred. No one testifies to having seen it being taken, and it is scarcely possible that it could have been done in the presence of the great number of people attracted to the scene by the explosion, and not be observed by some of them. That no one saw it go over to the "cinder pit" after the explosion is a circumstance in support of defendants' contention that it had gone there before. Plaintiff's witnesses failed to locate any one of these engines at a point other than that fixed by defendants' witnesses; in fact, plaintiff's witnesses have contributed much of the evidence which goes to show that these engines were, at the very moment when the explosion occurred, exactly where defendants contend they were.

Plaintiff's case rests upon the allegation of his witnesses as to how they saw and heard the car shunted into the dynamite car, and defendants' defense must rest upon their ability to establish, first, that there was no engine in the yards, at the time of the explosion, to have shunted a car; second, that from the location and number of cars on the tank track and its spur, south of where the explosion occurred, no car could have been shunted into the dynamite car unless the engine that did so afterward placed the other cars upon the track as they were found, by count and measurement, to be, and as partially shown by the photographs taken shortly after the explosion they were; third, that the dynamite was so packed that it could not have been exploded by the impact of a car or cars shunted with the force described by

the plaintiff's witnesses, even if all that they say is
true; and, lastly, that the rifle that was used was of
such penetrating force that its ball would pass
through the car and box, and into and explode the
dynamite.

This is a large record, and a great many witnesses
have testified.  Much of their testimony is merely
cumulative, and upon points not necessary to the
determination of the real questions in issue.  It is
only when the evidence of each witness is carefully
read, and his opportunities for observation consid-
ered, in connection with the physical facts, which are
not controverted, that the truth as to how the explo-
sion occurred can be ascertained.  With the record so
considered and analyzed, it is clear that no engine
shunted a car or cars into the dynamite car, for the
simple reason that not one was in a position to do so.
The witnesses who say that a car was shunted into
the dynamite car are so overwhelmed with the physi-
cal facts shown in the record, and other facts proven
—not by a preponderance of the evidence, but by the
evidence of many witnesses undisputed—that the
value of their testimony is destroyed.  Their state-
ments as to what caused the explosion are so com-
pletely refuted by the facts as shown by the record
that their testimony cannot be accepted as the basis
for a judgment to rest upon.  Excuse for their being
mistaken is not wanting.  Their minds, if not warped
by personal interest, have become confused in trying
to bridge the chasm made in the trend of current
events by the terrible catastrophe, and, while they no
doubt recall various movements of engines on that
day, they have evidently not done so in the natural
order in which they occurred.  No doubt they saw

engines shifting cars around and through the yards on that fateful morning, and heard them bump together as they were being so switched and shifted and coupled up and put through the various maneuvers necessary both to the breaking up of a train after it came into the yards and the making up of one preparatory to its leaving. Such scenes and sounds were neither strange nor new to them. Most of them lived in or near that town, the terminus of two great railroad systems, where many trains came and went every day. There was nothing in such sights or sounds that would impress their minds sufficiently to enable them to recall any particular one. It is common knowledge that by daily association with trains, and being in and around railroad tracks and yards, one becomes so accustomed to them that he sees the trains without paying any attention to them or their movements, and hears the noises incident to their operation almost without being conscious of it; and, in the absence of anything unusual in the movement of a train, it would be exacting almost the impossible to expect one, some time thereafter, to describe its movements with any degree of accuracy.

There was no reason for observing the movements of the engines, or any one of them, on that morning until after the explosion, and then the witnesses, in seeking for the cause, would naturally remember that they saw an engine shifting cars about the yards, or heard cars being shunted together with considerable, or more than usual, force. Several witnesses say they saw an engine shunt a car or cars into the dynamite car, and the explosion followed. They differ as to the kind of engine. Some say large; others small. Some say one car; others several. So, also,

as to the several witnesses who say they heard the force of the impact of the car that was shunted into the dynamite car. They differ as to the length of time that elapsed between the shunting of the cars together and the explosion. Some say that it occurred immediately; others that a considerable time elapsed. Clearly the shunting which was heard did not cause the explosion; for, if the force of the impact had been sufficient to cause the explosion, it would have followed the impact instantaneously, and the noise of the impact would have been lost in the sound of the explosion. If plaintiff's witnesses are correct, then after the explosion those in charge of the engine that shunted the car or cars into the car of dynamite deliberately and immediately set about to manufacture a defense. There in the midst of the greatest calamity that had ever befallen that community, within sight and hearing of their dead and wounded friends and comrades, they must have dropped the cars along the tank track, as the evidence shows they were, and then stealthily spirited the engine out of the yards, and all of this must have been done while others were so busy that they failed to observe the movements of this engine; for out of the numbers of witnesses who have testified no one saw any engine making any such movements. Had any such thing taken place, surely it would have been seen by some one, and the fact that it was not is strong evidence that it did not occur.

The defendants have demonstrated to a practical certainty that the bullet fired from the Rogers rifle caused the explosion. He was in no wise connected with either of the defendant companies, and they are not answerable for the result of his conduct.

Southern  Ry.  Co. v. Adkins' Admr.

Courts are ever reluctant to disturb the finding of a jury, and should decline to do so unless palpably against the evidence.   Still, when the ends of substantial justice would be defeated by permitting the judgment to stand, no court should hesitate to set it aside.   The case at bar presents such a condition. By the overwhelming weight of the evidence it is clear that the explosion was not caused by the shunting of a car into the dynamite car, or by any other act of negligence on the part of defendants or either of them, but by a wholly independent agency, one over which defendants, nor either of them, had any control whatever, and for which they are in no wise responsible.

The judgment should be reversed. For this reason, I dissent, and Judges HOBSON and BARKER join me.

NUNN, J. Appellants' counsel insist that they should be granted an oral argument in this case on the question discussed in the last 11 pages of the manuscript opinion, to wit, as to whether the railroads were guilty of actionable negligence in failing to exercise reasonable or any care to protect the public from injury when they left the car loaded with the explosives in the yards unguarded.  As this ques tion was not referred to in the oral argument had before the case was decided, it not being necessary to a determination of the case, as the action was tried out in the lower court on the sole question as  to whether the explosion occurred by reason of shunting cars against the one loaded with the explosives, or as to whether it was caused by a shot fired from a small rifle, we have concluded to withdraw that part of the opinion, and it is so ordered.

Therefore  the motion  for  oral argument  is refused, and the petition for rehearing is overruled.